USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/18/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Irving H. Picard,<br>Plaintiff,<br>–v–<br>Sage Realty, *et al*.,<br>Defendants. | 20-cv-10109 (AJN)<br>MEMORANDUM OPINION & ORDER |
| Irving H. Picard,<br>Plaintiff,<br>–v–<br>Sage Associates, *et al*.,<br>Defendants. | 20-cv-10057 (AJN)<br>MEMORANDUM OPINION & ORDER |

ALISON J. NATHAN, District Judge:

Defendants move to withdraw the reference to the bankruptcy court of the adversary proceeding initiated against them by Plaintiff the Trustee, which was brought to avoid and recover purportedly fraudulent transactions from Bernard L. Madoff Investment Securities LLP. For the reasons that follow, the Court determines that withdrawal of the reference is mandatory under 28 U.S.C. § 157(d) and GRANTS Defendants' motion.

## I. BACKGROUND

Immediately following Bernie Madoff's arrest on December 11, 2008 for securities fraud, Bernard L. Madoff Investment Securities, LLC ("BLMIS") was placed into liquidation proceedings pursuant to the Securities Investor Protection Act ("SIPA"). *See SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF Dkt. Nos. 4-6. The Court appointed Irving H. Picard, Esq. ("the Trustee") as a trustee and removed the proceedings to the United States Bankruptcy Court for the Southern District of New York, as mandated by SIPA, 15 U.S.C. § 78eee(b)(4). *Id.* After a thorough investigation of BLMIS, the Trustee found, with very few exceptions, no securities were ever purchased on behalf of customers and that any "profits" were fictious, as BLMIS simply paid customers with moneys from other customers' initial investments in the fashion of a traditional Ponzi scheme. Case No. 20-cv-10057, Dkt. No. 7 at 5.[1]

Pursuant to SIPA, which "establishes procedures for liquidating failed brokerdealers," the Trustee created "a fund of customer property" in order to prioritize distribution to BLMIS customers. *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 132-33 (Bankr. S.D.N.Y. 2010), *aff'd*, 654 F.3d 229 (2d Cir. 2011) (quotations omitted). Each customer is entitled to a pro rata portion of that fund to the extent of their net equity. *Id*. (citing 15 U.S.C. § 78fff-2(c)(1)(b)). Under SIPA, "net equity" is "the dollar amount of the accounts or accounts of a customer," which, is determined by "calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date . . . all securities positions of such customer . . ." minus "any indebtedness of such customer to the debtor ." 15 U.S.C. § 78lll(11).

[1] All docket citations are to 20-cv-10057 unless otherwise stated.

In administering the fund, the Trustee determined that not all of BLMIS customers fared equally after the Ponzi scheme collapsed. Some customers, despite being victims of the fraud, were nonetheless "net winners," in that they withdrew more funds from BLMIS than they deposited. Dkt. No. 7 at 5. These were funds simply taken from the investments of other BLMIS customers. *Id.* The Trustee initiated over a thousand avoidance actions in Bankruptcy Court to avoid and recover these fraudulent transfers so they could be ratably distributed to the "net losers" of the BLMIS fraud, i.e., those who had deposited more into the investment fund than they withdrew. *Id.* For purposes of these proceedings, the "net winners" are further divided into those who received transfers in "bad faith" and "good faith," and for the latter category, recovery is limited to transfers made within the two-year period preceding the date of Madoff's arrest. *Id.* at 4-5.

As part of this process, the Trustee brought an adversary proceeding in Bankruptcy Court against the individual and entity defendants in this action, who the Trustee contends are "net winners" within the "good faith" safe harbor provision, and thus are subject to the "Two-Year Transfers" rule. Dkt. No. 3 at 2. The Trustee seeks to avoid and recover a $13,510,000 transfer to Defendant Sage Associates and a $3,370,000 transfer to Defendant Sage Realty, and to hold the individual defendants jointly and severally liable for those transfers in their alleged capacities as partners or joint venturers. *Id.* at 2-3. Defendants answered The Trustee's Amended Complaints and proceeded to discovery. *Id.* Discovery has concluded and the case is near trial-ready. *Id.*

On December 1, 2020, Defendants filed a motion for this Court to withdraw the bankruptcy reference in both proceedings. Dkt. No. 1. As the proceedings against Defendant Sage Realty and Defendant Sage Associates have proceeded together in bankruptcy court, the

Court accepted those cases as related and considers the motions together. *See* Case No. 20-cv-10109, Dkt. No. 4 at 2. The parties have informed the Court that the Bankruptcy Court has stayed the case pending resolution of the instant motions at their request. Dkt. No. 12. After Defendants' motion was fully briefed, the Court invited supplemental briefing on the issue of whether "substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of this proceeding," and thus whether withdrawal is mandatory under 28 U.S.C. § 157(d). Dkt. No. 13. Plaintiff filed a sur-reply and Defendants filed a response. Dkt. Nos. 14, 17.

## II. DISCUSSION

District courts may "provide that any and all cases under title 11 . . . shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a). In the Southern District of New York, all cases and proceedings arising under or related to a bankruptcy case, including liquidations under the SIPA, are automatically referred to the Bankruptcy Court. *In the Matter of Standing Order of Reference Re: Title 11*, No. 12-mc-00032 (S.D.N.Y. Jan. 31, 2012). Despite the automatic referral, a Court must withdraw the reference if it determines that "resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d). Even if withdrawal is not mandatory, the Court is also permitted to withdraw a case or proceeding for "cause shown." 28 U.S.C. § 157(d).

Defendants claim that the Court is required to withdrawal the reference under the mandatory withdrawal provision of 28 U.S.C. § 157(d). They argue that the adversary proceeding involves the "substantial and material consideration of non-Bankruptcy Code federal statues," specifically whether the Trustee is permitted under SIPA to calculate Defendants net

equity in the customer fund using a process called the "Net Investment Method." They also argue that, even if withdrawal is not mandatory, the Court should exercise its discretion to withdraw because the individual defendants have made jury demands.

For the reasons that follow, the Court agrees with Defendants that withdrawal of the reference is mandatory because of the issues presented in the adversary proceedings. Because withdrawal is mandatory, the Court need not discuss Defendants' request to withdraw under the permissive provision of 28 U.S.C. § 157(d).

**A. The Net Investment Method and the *Net Equity Decision***

Understanding the nature of the issues presented in the adversary proceeding requires some background on how the BLMIS customer fund has been administered and the Second Circuit's decision in *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d Cir. 2011) (the "*Net Equity Decision*"). In administering the customer fund set up for customers of BLMIS under SIPA, the Trustee was required to distribute funds to customers based on their "net equity." After sorting through decades worth of fraudulent transfers and recordkeeping from BLMIS, the Trustee chose what is called the "Net Investment Method" in calculating BLMIS customers' net equity. *Id.* at 233. Under this method, net equity is the amount of cash deposits that any given customer made to BLMIS subtracted by the amount of any cash withdrawals they received from BLMIS. *Id*. As a result, only those who were the "net losers" of the Madoff fraud were entitled to recover from the fund. *Id*. For that reason, Defendants' claims to the customer fund were denied by the Trustee. *See* Dkt. No. 7 at 2. Some customers argued that instead of the Net Investment Method, the Trustee should utilize the "Last Statement Balance" Method, under which a customer would be entitled to recover the market value of the securities, as reflected on

their last customer statement that had been issued to them by BLMIS. *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 233-34.

The Second Circuit was presented with the question in the *Net Equity Decision* of whether the Trustee's choice of method for calculating the BLMIS claimants "net equity," the Net Investment Method, was permissible under SIPA. *Id.* at 235. The Second Circuit explained that the "the statutory language does not prescribe a single means of calculating 'net equity' that applies in the myriad circumstances that may arise in a SIPA liquidation." *Id.* SIPA requires only that "net equity" be determined by "calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase . . . all securities positions of such customer . . . minus . . . any indebtedness of such customer to the debtor . . ." *Id.* at 237 (citing 15 U.S.C. § 78*lll*(11)). In many instances, a customer's "securities position" with a debtor may be best determined by reference to their account statements, i.e. via a method such as the Last Statement Balance method, as opposed to the Net Investment Method, which "wipes out all events of a customer's investment history except for cash deposits and withdrawals." *Id.* at 237-38. But, the Second Circuit explained that SIPA also requires that the Trustee "make payments to customers based on 'net equity' insofar as the amount owed to the customer is 'ascertainable from the books and records of the debtor or [is] otherwise established to the satisfaction of the trustee.'" *Id* (citing 15 U.S.C. § 78fff–2(b)). According to the Second Circuit, if the customers' account statements are based entirely on the fabrications of a fraudulent debtor and thus do not reflect any real "securities positions," then SIPA does not require the Trustee to rely on those statements in determining amounts "owed by the debtor" to the customer for the purposes of net equity. *Id.* In such cases, a method such as the Net Investment Method is more appropriate. *Id.*

The Second Circuit then applied these principles to the BLMIS customers involved in that appeal, which were the ones for whom Madoff claimed to have implemented the "split-strike conversion" investment strategy.[2] *Id.* at 231 & n.1. Representing the vast majority of accounts at BLMIS, the "split-strike" accounts were customers who had "relinquish[ed] all investment authority to Madoff." *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 128-30. Madoff would then put their cash investments in a "slush fund," out of which Madoff would pay other customers fictious returns and make withdrawals to enrich himself, his family, and his associates. *Id*. For these customers, Madoff never actually used customer funds to purchase any securities. *Id*. Instead, he provided customers with fraudulent "customer statements" that reflected fictious returns, the amounts of which were determined based on "historical price and volume data for each stock" that BLMIS had pretended to purchase. *Id*. Thus, these customer statements were "bogus" and "devoid of any connection to market prices, volumes, or other realities." *Id.* at 130.

The Second Circuit held that, for these customers, "Mr. Picard's selection of the Net Investment Method was more consistent with the statutory definition of 'net equity' than any other method advocated by the parties or perceived by this Court," considering that the "[u]se of the Last Statement Method in this case would have the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's machinations." *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 235. But the Court was careful to note that while "the extraordinary facts of this case make the Net Investment Method appropriate," there are "many instances[] [where] it would not be." *Id.* at 238. In more "conventional cases," the

[2] This was a "strategy" where BLMIS purportedly "invested customer funds in a subset, or 'basket,' of Standard & Poor's 100 Index ("S & P 100 Index") common stocks, and maximized value by purchasing before, and selling after, price increases." *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 129-30. This "strategy" was never actually used, however, as no securities were ever purchased for these customers, and in fact it would have been impossible to implement, according to subsequent investigations. *Id.*

"last account statement will likely be the most appropriate means of calculating 'net equity'[.]" *Id.* Specifically, the Second Circuit noted that "[t]he Last Statement Method, for example, may be appropriate when securities were actually purchased by the debtor, but then converted by the debtor . . . Indeed, the Last Statement Method may be especially appropriate where—unlike with the BLMIS accounts at issue in this appeal—customers authorize or direct purchases of specific stocks." *Id*.

**B. The Defendants' Customer Accounts**

There is a subset of BLMIS customers who were not parties to the appeal in the *Net Equity Decision* and are on different footing than the BLMIS customers in that case. For around 5% of accounts, Madoff did not utilize his traditional "split-strike conversion" investment strategy. *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. at 130-31. For this small group, which was comprised of "devoted customers" and "Madoff family members and employees," Madoff handled the accounts on an "account-by-account" basis, purportedly executing special trades and generating even higher (fictitious) returns. *Id*. Although the so-called split-strike conversion strategy was not used, BLMIS still engaged in the same fraudulent scheme of generating fictitious profits based on "after-the-fact published selections of stocks and related prices" for most of these V.I.P. accounts. *Id.* However, there were a very small amount of customers within this subset for whom BLMIS did actually make "a few isolated trades" and who entrusted to BLMIS "physical custody of a limited number of securities. . ." *Id*.

Defendants claim to belong to this minority of the minority of BLMIS customers, distinct from both the split-strike customers and non-split strike customers consisting of family and friends who received even greater returns. Defendants, who were longstanding customers of BLMIS but were not Madoff family members, friends, or employees, claim that unlike the other

BLMIS customers, they never "receive[d] invented account statements." Dkt. No. 9 at 7 & n.4. Instead, "Defendants' account statements" allegedly "contained the securities that they authorized and directed Madoff to purchase and their accounts tracked the returns of the securities in which they instructed Madoff to invest." *Id*. Therefore, even though BLMIS never purchased any trades on behalf of Defendants, Defendants claim that their account statements "mirrored what would have happened had the given transaction[s] been executed," and for that reason they argue Net Investment method should not apply to them. Dkt. No. 17 at 4. The Trustee argues to the contrary that the Net Investment method is still an appropriate method for calculating the Defendants net equity.

**C. The Issues Presented in the Adversary Proceeding**

One of the primary issues presented in the adversary proceeding is whether the Net Investment Method can be applied to the Defendants' customer accounts. As discussed below, answering that question will likely require the court to engage in new and significant interpretations of SIPA.

**1. The Appropriate Method for Calculating the Defendants' Net Equity**

Assuming that the Defendants' account statements do in fact track securities that the Defendants directed BLMIS to purchase, then the court overseeing this case will need to decide how their accounts should be treated under SIPA. That is a question of statutory interpretation. Specifically, if a customer's account statements contain trades that they authorized and directed, but that were never actually executed, are those statements accurate reflections of the customer's "securities positions" for the purposes of "calculating the sum which would have been owed by the debtor to [the] customer" under § 78*lll*(11) of SIPA? Are amounts owed based on those

statements "ascertainable from the books and records of the debtor or [] otherwise established to the satisfaction of the trustee" under § 78fff-2? Or to the contrary, should those customers' statements also be considered fictitious and unreliable, like those of the BLMIS customers in the *Net Equity Decision*, considering that no securities were actually purchased?

These questions are unsettled. The Second Circuit suggested the possibility that a customer's account statements should be relied upon under these circumstances in the *Net Equity Decision* when it noted in dicta that "the Last Statement Method may be especially appropriate where . . . customers authorize or direct purchases of specific stocks," though the Court did not clarify if that is also the case if the stocks were never actually purchased. *Id*. at 238. There is also precedent for a SIPA Trustee to decide in the first instance to credit a customer's account statements in those situations. *Id*. at 240 (examining that in a prior case where customers were misled by the debtor into believing that they were investing in existing mutual funds, and their account statements mirrored what would have happened if the transactions had been executed, the SIPA Trustee decided to reimburse the customers based on their account statements). Therefore, without delving into the merits prematurely, the Court notes that, contrary to the Trustee's contention, it may be the case that the most appropriate method for calculating the Defendants' net equity under SIPA is the Last Statement Balance method.

**2. Whether the Net Investment Method is Permissible**

Next, assuming it is true that under SIPA the Defendants' account statements should be relied upon for determining their "securities positions" for the purposes of calculating net equity, that would not end the inquiry. The question in this adversary proceeding is not merely which method is most appropriate to determine the Defendants' net equity, but whether the Net Investment Method, the method that the Trustee has already chosen, is a *permissible* method as a

matter of law under SIPA. Specifically, if a customer's account statement is an accurate or reliable representation of their "securities positions," is it still permissible for the Trustee to use the Net Investment Method to "calculate sums owed" under § 78*lll*(11) SIPA, considering that doing so would "wipe[] out all events of a customer's investment history except for cash deposits and withdrawals[?]" *Id*. at 238.

That question is also unsettled. On one hand, the Second Circuit stated that there are many instances where the Net Investment Method would "not be" "appropriate," and suggested that might be the case if a customer's account statement reflected trades that it had authorized or directed. *Id.* But the Second Circuit also cautioned that the method chosen should comport with the objective of SIPA that the Trustee "achieve a fair allocation of the available resources among the customers." *Id.* at 240. Arguably, even if a method is not the best for measuring net equity as statutorily defined for a particular customer, a method may nonetheless still be "appropriate" if it would result in a more equitable allocation of the customer fund as a whole. Part of the Second Circuit's decision to permit the Net Investment Method in the *Net Equity Decision* was that "if customers receive" reimbursement "based on property that is a fiction," it "will necessarily diminish the amount of customer property available to other investors." *Id.* at 240. Therefore, the law is far from clear on what kind of situations the Trustee would be precluded from using the Net Investment Method.

### 3. The Trustee's Power to Choose the Net Investment Method Even if the Last Statement Balance Method is Superior

If it is the case that the Net Investment Method is a permissible method for calculating the Defendants' net equity but inferior to the Last Statement Balance method, the Court will be directly confronted with determining whether the Trustee nonetheless has the inherent discretion

to choose that method as part of its powers and duties in administering a fund under SIPA. This too is an unsettled question. In the *Net Equity Decision*, the Second Circuit noted the following in dicta and in a footnote:

> "Because we find that, in this case, the Net Investment Method advocated by Mr. Picard is superior to the Last Statement Method as a matter of law, we have no need to consider whether a SIPA trustee may exercise discretion in selecting a method to calculate 'net equity.' Fraud is endlessly resourceful and the unraveling of weaved-up sins may sometimes require the grant of a measure of latitude to a SIPA trustee. It therefore appears to us that in many circumstances a SIPA trustee may, and should, exercise some discretion in determining what method, or combination of methods, will best measure 'net equity.' We have no reason to doubt that a reviewing court could and should accord a degree of deference to such an exercise of discretion so long as the method chosen by the trustee allocates 'net equity' among the competing claimants in a manner that is not clearly inferior to other methods under consideration."

*In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d at 238 n.7. In a subsequent opinion, the Second Circuit referred to its suggestion that "a SIPA trustee should 'exercise some discretion'" in the *Net Equity Decision* as "dicta" and again declined to answer the question. *See In re Bernard L. Madoff Inv. Sec. LLC*, 779 F.3d 74, 80 (2d Cir. 2015). And neither § 78fff-1, which covers the "Powers and duties of a trustee" under SIPA, nor § 78*lll*(11), which defines net equity, discuss whether the Trustee has discretion for choosing how to calculate net equity, and if so, to what degree. Therefore, determining if the Trustee is permitted to use the Net Investment Method for calculating the Defendants' net equity may very well require the court to hold as a matter of law for the first time the scope of a Trustee's power to choose a method for calculating net equity under SIPA.

**D. Withdrawal is Mandatory**

Mandatory withdrawal exists "to assure that an Article III judge decides issues calling for more than routine application of [federal laws] outside of the Bankruptcy Code." *Enron Power*

*Mktg. v. Cal. Power Exch. (In re Enron),* No. 04–cv–8177, 2004 WL 2711101, at *2 (S.D.N.Y. Nov. 23, 2004) (alteration in original). However, the mandatory withdrawal provision of § 157(d) is "to be construed narrowly, so that it does not become an 'escape hatch' for matters properly before the bankruptcy court." *In re Johns-Manville Corp.*, 63 B.R. 600, 603 (S.D.N.Y. 1986). As such, mandatory withdrawal under this provision is "reserved for cases where substantial and material consideration of non-Bankruptcy Code federal statutes is necessary for the resolution of the proceeding." *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 995 (2d Cir. 1990).

The "'substantial and material consideration' element for mandatory withdrawal is satisfied where resolving the action would require the bankruptcy court to 'engage itself in the intricacies' of non-bankruptcy law. . ." *In re Ames Dep't Stores Inc.*, 512 B.R. 736, 741 (S.D.N.Y. 2014). Thus, a "simple application[] of federal laws apart from the bankruptcy statutes" does not constitute "substantial and material" consideration. *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. 307, 312 (S.D.N.Y. 2011) (citing *City of New York v. Exxon Corp*., 932 F.2d 1020, 1026 (2d Cir. 1991)). Withdrawal is instead mandatory "when complicated interpretive issues . . . of first impression, have been raised under non-Title 11 federal laws*."* *In re Adelphi Inst., Inc*., 112 B.R. 534, 537 (S.D.N.Y. 1990). *See also In re Enron Power Mktg., Inc*., No. 01 CIV.7964, 2003 WL 68036, at *5 (S.D.N.Y. Jan. 8, 2003) (determining withdrawal was not mandatory in "a relatively simple action for breach of contract that will not necessitate interpretation—let alone substantial interpretation of issues of first impression.").

This case involves "substantial and material consideration" of SIPA, a non-bankruptcy code federal statute. *In re Ionosphere Clubs, Inc*., 922 F.2d at 995. While the Trustee contends

that the bankruptcy court will merely need to "apply the *Net Equity Decision* to the facts to be adduced at the coming trial," resolution of this proceeding involves much more than a routine application of settled law. The proceeding raises the issues of whether the Net Investment Method is permissible if a customer has directed and authorized trades but those trades were not executed, and also whether the Trustee has the discretion to choose between competing methods of calculating net equity generally. As discussed above, "[n]either the language of the statute nor existing interpretive precedents provide clear answers" to these significant questions. *In re Johns-Manville Corp*., 63 B.R. at 603 (S.D.N.Y. 1986). *See also Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec*. LLC, 454 B.R. 307, 313 (S.D.N.Y. 2011) (determining that, because an issue of interpretation of non-bankruptcy law was "an open question in this Circuit," withdrawal was mandatory). To the contrary, the bankruptcy court would be required to interpret SIPA in the first instance to address these substantial issues.

And while it may be true that the bankruptcy court naturally will have expertise with SIPA, "[r]egardless of a bankruptcy court's familiarity with a statute outside of Title 11, the requirements for mandatory withdrawal are satisfied if the proceeding requires" substantial and material "consideration of a law outside of Title 11." *Sec. Inv. Prot. Corp.*, 454 B.R. at 316. Courts in this district have already held that similar kinds of questions regarding a customer's claims and the powers of the Trustee under SIPA mandate withdrawal. In *Fairfield Greenwich*, the court held that determining whether a plaintiff's securities claims against the Defendants are "customer property" as defined by SIPA "necessarily involves a significant interpretation of federal law outside the Bankruptcy Code." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 486 B.R. 579, 583 (S.D.N.Y. 2013). Another court held that "determining if the Trustee has standing [to sue] as an assignee of [BLMIS] customers," an unsettled question of law,

required "substantial interpretation of SIPA." *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 454 B.R. at 315.

In sum, as this case squarely involves "a matter of first impression, undecided by the Second Circuit," that requires "significant interpretation and application of non-bankruptcy federal law," the Court must withdraw the reference. *In re Joe's Friendly Serv. & Son Inc.*, No. 14-BK-70001(REG), 2019 WL 6307468, at *6 (E.D.N.Y. Nov. 25, 2019) (cleaned up).

## III. CONCLUSION

For the reasons stated above, Defendants' motions are GRANTED. The references to the bankruptcy court in 20-cv-10109 and 20c-cv-10057 are withdrawn. This resolves Dkt. No. 1 in both cases. The parties are to submit a joint letter by **June 14, 2021** updating the Court on the status of discovery and providing a proposal for next steps.

SO ORDERED.

Dated: May 18, 2021
New York, New York

ALISON J. NATHAN
United States District Judge